TRI–STAR PICTURES, INC., Plaintiff,

v.

Kurt UNGER, Leisure Time Productions, B.V., Academy Pictures, A.G., and David N. Bottoms and Hon. Raya S. Dreben as Executors of the Estate of Samuel Spiegel, Defendants.

Leisure Time Productions, B.V., Third–Party Plaintiff,

v.

Columbia Pictures Industries, Inc., Columbia Pictures Entertainment, Inc. and Horizon Pictures, G.B., Third–Party Defendants.

No. 88 CIV. 9129 (DNE).

United States District Court, S.D. New York.

March 22, 1999.

Ira S. Sachs, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for Plaintiffs.

Gary Dennis Centola, Rivkind, Radler & Kremer, Uniondale, NY, for Defendants.

## OPINION & ORDER

EDELSTEIN, District Judge.

### Background

The history of this case is found in *Tri–Star Pictures, Inc. v. Unger*, 14 F.Supp.2d 339 (S.D.N.Y.1998). Only those facts needed to resolve the present dispute are set forth herein.

Plaintiffs, Columbia Pictures Industries, Inc. ("Columbia") and Academy Pictures A.G. ("Academy") (collectively, "Plaintiffs") brought an action for trademark infringement, unfair competition, and dilution and injury to business reputation pursuant to 15 U.S.C. § 1125, § 360–1 of the New York General Business Law, New York Law, and the common law against Defendants Leisure Time Productions, B.V. ("Leisure Time") and Kurt Unger ("Unger") (collectively, "Defendants"), to permanently enjoin Leisure Time and Unger from releasing, distributing, or advertising in the United States, their produced, but unreleased, motion picture entitled "Return from the River Kwai", using that title or any other title containing the words "River Kwai" or any other confusingly

similar titles. The case was tried as a bench trial from July 14–16, 1997.

In a July 13, 1998 opinion, this Court held that Plaintiffs' mark, "River Kwai", was entitled to trademark protection and granted the injunctive relief that Plaintiffs sought. *See Unger,* 14 F.Supp.2d at 359. Having found that Defendants engaged in willful infringement, this Court also held that this was an "exceptional case" that was ripe for an award of attorneys' fees and costs pursuant to § 35 of the Lanham Act. *See id.* at 364; *see also* 15 U.S.C. § 1117(a). Columbia requests $735,785.73 and Academy seeks $494,403.28. *See* Affidavit of Ira S. Sacks in Supp. of Columbia's Application for Attorney's Fees and Costs ("Sacks Aff.") at ¶ 15; Memorandum in Supp. of Application by Plaintiff Academy Pictures, A.G. for Attorney Fees and Costs ("Academy Mem.") at 25. Plaintiffs and Defendants provided this Court with memoranda and affidavits in support of and in opposition to an award of attorneys' fees and costs to Plaintiffs.

In addition to a straight application for attorneys' fees and costs against Defendants, Academy made a motion requesting that this Court also hold Defendants' former attorneys, "Rivkin, Radler & Kremer" ("RRK"),[1] jointly and severally liable for Academy's attorneys' fees. *See* Academy Mem. Academy asserts that not only Defendants, but also their counsel, "acted in bad faith in numerous instances throughout the duration of this litigation, [by] repeatedly burdening [P]laintiffs with baseless claims and motions, with irrelevant and dilatory discovery and procedural tactics, and by advancing arguments and positions wholly without merit." Academy Mem. at 18.

### Discussion

■ Before turning to a determination of the amount of attorneys' fees and costs owed to Plaintiffs, this Court will first

determine whether Defendants' attorneys, RRK, must also reimburse Plaintiffs. In assessing whether an attorney must also pay for an opposing party's attorney fees, a court must study the attorney's conduct in the litigation. As a preliminary matter, it is important to note that three separate law firms represented Defendants at different times through the course of this litigation. *See* Memorandum of Law of Defendants Leisure Time Productions, B.V. and Kurt Unger in Opp'n to the Application of Columbia and Academy for an Award of Attorneys Fees and Costs ("Defendants Mem.") at 6.

This case commenced in December, 1988. It was not until April, 1995, that RRK began its representation of Defendants. *See* Defendants Mem. at 2, 3. Academy fails to distinguish between the conduct of the three firms that represented Defendants, but rather merely condemns the strategy of "Defendants' attorneys". While this Court can certainly expect RRK's attorneys to have familiarized themselves with all prior proceedings in this case, this Court will not hold RRK responsible for the actions of prior counsel. Thus, the propriety of Defendants' attorneys' conduct before April, 1995 is not an issue before this Court. *See Motown Productions, Inc. v. Cacomm, Inc.,* 849 F.2d 781, 783 (2d Cir. 1988). Consequently, any of Academy's allegations of bad faith attorney conduct that occurred prior to April, 1995 will not be imputed to RRK.

### I.  RRK's Liability for Fees and Costs:

The Second Circuit has afforded district courts broad discretion in considering sanction claims but has also cautioned courts to be circumspect in their analysis of such claims. *See Oliveri v. Thompson,* 803 F.2d 1265, 1280 (2d Cir.1986). Specifically, the Second Circuit stated:

---

1. At some point, from the time RRK submitted the motion on behalf of Defendants in opposition to an award of attorneys' fees and costs on September 21, 1998, RRK ended its representation of Defendants.

[T]o deal effectively, fairly, and efficiently with sanction claims, district courts have a difficult task, but wide discretion. In exercising that discretion, however, it is essential that the questions be closely analyzed and that proper sanctioning principles be applied.... Courts should be sensitive to the impact of sanctions on attorneys. They can be economically punishing, as well as professionally harmful ....

*Id.*

In heeding this warning, courts have recognized several bases upon which to hold counsel liable for another party's attorney's fees and costs. *See, e.g., Motown,* 849 F.2d 781 (analyzing Rule 11 of the Federal Rules of Civil Procedure, providing for sanctions against attorneys who sign a meritless pleading or untenable motion, and § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a)); *Viola Sportswear, Inc. v. Mimun,* 574 F.Supp. 619 (E.D.N.Y.1983) (stating that a court may assess attorney fees against counsel based on Rule 11, 15 U.S.C. § 1117(a), 28 U.S.C. § 1927, which permits a court to require attorneys who multiply the costs of litigation unreasonably and wantonly to pay for those excess costs, or the inherent authority of a court over members of its bar). This Court will examine RRK's conduct with respect to the standards developed in conjunction with § 35(a) of the Lanham Act, the inherent power of a court to control the attorneys appearing before it, and 28 U.S.C. § 1927.

### A. § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a):

This Court has already noted that § 35(a) of the Lanham Act provides for the award of attorney's fees and costs in "exceptional cases." *See Unger,* 14 F.Supp.2d. at 364; *see also* 15 U.S.C. § 1117(a). The Second Circuit has held that while the statute does not specifically authorize a district court to require counsel to pay for attorney's fees and costs rather than the client, "it seems proper to permit the district court to impose the sanction in whole or in part, against the attorney when it finds that the improper conduct was caused by the attorney rather than the client." *Motown,* 849 F.2d at 786; *see also Viola,* 574 F.Supp. at 620–21 (declaring that a court must construe "exceptional" circumstances to include a case that is utterly without merit).

In *Viola,* in finding that the case was "exceptional", the district court held plaintiffs and their attorneys jointly and severally liable for attorney fees for the suit they initiated. 574 F.Supp. 619. In that case, plaintiff entered into an exclusive licensing agreement with defendants to manufacture and sell children's Sasson jeans. *See id.* at 619. Subsequent to this agreement, defendants sent one ten dollar pair of such jeans to a third-party as part of a group of production samples that were sold before plaintiff obtained the exclusive right to sell. *See id.* at 619–20. Plaintiff interpreted defendants' action as an apparent sale of children's Sasson jeans in violation of the licensing agreement. *Id.* at 619. Thereafter, Plaintiff commenced a suit alleging a nationwide trademark conspiracy and deception and unfair competition by defendants. *See id.*

In emphasizing the bad faith that permeated the case, the *Viola* Court noted that "[n]o effort was made by the plaintiff to make any investigation of the facts prior to filing the complaint nor was any effort made to inquire of the ... defendants as to the validity of the charges made in the complaint." *Id.* at 620. In fact, the deposition of plaintiff's corporation president conclusively established that plaintiff had no concrete information upon which to base its lawsuit. *Id.* "He candidly admitted" in his deposition that he (1) never reviewed the complaint before it was filed, (2) never possessed any evidence upon which a reasonable person might have formed the belief that the charges in his complaint were valid, (3) only knew of the single pair of jeans at issue, (4) had no support that defendants perpetrated a na-

tionwide conspiracy, and (5) recognized the possibility that the jeans in question may have been manufactured and sold prior to the consummation of the exclusive licensing agreement. *See id.*

The allegations that plaintiff brought in *Viola* were so devoid of merit that the district court was able to dismiss the action on a summary judgment motion. *See id.* Further, plaintiff effectively admitted to its bad faith as demonstrated by its agreement to discontinue the suit if "defendants agreed to release the plaintiff from any liability or sanctions to which the plaintiff might be exposed on account of the action it commenced," and its failure to oppose defendants' summary judgment motion. *Id.* Based on such a record, the district court easily concluded that the case was "exceptional" and that the charges that plaintiff brought and that its attorneys presented could "hardly be said to be well grounded in fact and [could] appropriately be characterized as . . . charge[s] that [were] frivolous and in support of which a good faith argument on the merits could not be made." *Id.* at 621.

While this Court has found that the instant litigation is an "exceptional case" to the extent that Defendants are required to pay Plaintiffs' attorneys' fees and costs, it is extremely different than a case like *Viola* that reeked of bad faith to the point that the district court found that the attorneys were also responsible for the egregious bad faith. Unlike *Viola*, this Court held on two occasions that material issues of fact existed such that it would be improper for this Court to dismiss the case on summary judgment. *See Tri–Star v. Columbia Pictures Industries, Inc.*, No. 88 Civ. 9127 (DNE), 1992 WL 296314 (S.D.N.Y. Oct.6, 1992); *Tri–Star v. Leisure Time*, 749 F.Supp. 1243 (S.D.N.Y. 1990). In 1990, this Court stated that "*a complete factual record [had] to be established* to demonstrate both whether 'Bridge on the River Kwai' [had] attained secondary meaning and whether a reasonable consumer would find the title 'Bridge on the River Kwai' confusingly similar to 'Return from the River Kwai.' " *Leisure Time*, 749 F.Supp. at 1253 (emphasis added). Again in 1992, this court held:

> [T]here exist disputed issues of fact as to, inter alia, (1) whether Academy is guilty of laches; (2) whether Academy's mark is sufficiently strong to merit expansive trademark protection; and, (3) whether the term "River Kwai" has acquired secondary meaning and, indeed, whether the term denotes a geographical location or is fanciful shorthand for the "River Kwai Noi."

*Columbia Pictures*, 1992 WL 296314, at \*7. Thus, early on in this litigation, this Court indicated that it would need to consider and rule upon the issues at a trial.

Additionally, many of the allegations that Academy highlights in its papers as evidence of attorney misconduct occurred before Defendants retained RRK as counsel in April, 1995. Moreover, the events that did occur after April, 1995 do not demonstrate that RRK defended this action in bad faith. Academy alleges that Defendants' attorneys conducted an unnecessary and frivolous discovery campaign. *See* Academy Mem. at 6–9, 19. First, it is important to recognize that the discovery undertaken throughout this litigation was indeed necessary to gather evidence for issues that this Court twice ruled needed to be adjudicated at trial. Second, many of the depositions that Defendants' attorneys took occurred prior to RRK's representation of Defendants. *See* Defendants Mem. at 12. Third, of the fifteen depositions that Defendants' counsel performed, Academy specifically refers to excerpts of only five depositions, two of which were taken before RRK's involvement in April, 1995. *See id.* at 11. Fourth, the attorneys for Leisure Time, Columbia, and Academy offered testimony from twelve of the fifteen depositions to substantiate their claims at trial, thereby, demonstrating their worth. *See id.* at 12. Fifth, despite that this Court has had the opportunity to do so on several occasions, this Court nev-

er suggested that any of the discovery that Defendants' counsel undertook was outrageous. *But see Einhorn Yaffee Prescott Architecture & Eng'g, P.C. v. J. Louis Turpin, Rhinebeck Architecture & Planning, P.C.*, No. 94 CV. 830, 1995 U.S. Dist. Lexis 20546, at *17–18 (N.D.N.Y. May 12, 1995) (noting that the Magistrate Judge characterized the attorney's conduct in the discovery of the case as outrageous).

Academy also argues that RRK improperly denied certain facts in response to Academy's request to admit. *See* Academy Mem. at 9–11. This Court had the opportunity to consider the adequacy and propriety of Defendants' answers to Academy's requests for admissions when Academy brought them before this Court during a pre-trial conference, and this Court did not rule that Defendants' responses demonstrated bad faith. *See* Defendants Mem. at 11. In addition, some of the requests that Academy points out demanded answers to the critical questions of this case and were the very issues that this Court held needed to be resolved at trial, making the responses that Defendants provided before trial effectively irrelevant. *See Columbia Pictures*, 1992 WL 296314, at *7; *Leisure Time*, 749 F.Supp. at 1253. For example, requests five and six asked whether "Bridge on the River Kwai" had acquired secondary meaning and requests seventeen and eighteen asked whether Academy was guilty of laches. *See* Academy Mem. at 10–11. Moreover, while Defendants' counsel may have denied certain requests to admit, RRK did stipulate to twenty-one pages of facts prior to trial. *See* Joint Pre–Trial Order.

**B. A Court's Inherent Authority and 28 U.S.C. § 1927:**

■ The standards for awarding attorney's fees under the inherent power of this Court or under 28 U.S.C. § 1927 are the same. *See Oliveri*, 803 F.2d at 1273; *Agee v. Paramount Communications, Inc.*, 869 F.Supp. 209, 212 (S.D.N.Y.1994). Pursuant to its inherent authority, a court may

impose an award upon a party or its attorney(s) for prosecuting or defending an action in "bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *accord Oliveri*, 803 F.2d at 1272. Similarly, § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

Under either avenue, the Second Circuit has permitted an award of attorney's fees restrictively. The Second Circuit has held:

> To ensure, however, that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both "'clear evidence' that the challenged actions 'are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes'" and "a high degree of specificity in the factual findings of [the] lower courts."

*Oliveri*, 803 F.2d at 1272 (quoting *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (citations omitted)). Thus, to assess attorney's fees against counsel, a district court should look for demonstrative bad faith in the attorney's conduct.

This Court, however, cannot find "highly specific clear evidence" in the facts of this case to warrant imposing the obligation of liability for attorneys' fees upon RRK. Academy has presented this Court with sparse and unspecific allegations that do not clear the hurdles that the Second Circuit has defined. First, it is problematic that Academy did not differentiate be-

tween the three firms that represented Defendants. Broad sweeping allegations against Defendants' "counsel" without stating which firm is responsible for which actions, or even recognizing that more than one firm served as Defendants' counsel, does not demonstrate clear evidence to this Court that the asserted bad faith is "personal" to RRK. *Dow Chemical,* 782 F.2d at 344. Second, the deficient examples of bad faith that Academy offers this Court, *see supra* part A.1, do not rise to the level of bad faith that other courts have required to satisfy the standards. *See Agee,* 869 F.Supp. at 211, 212 (noting that plaintiff's counsel, *inter alia,* named more than 100 defendants from across the country over whom the court had no jurisdiction and obtained an ex parte TRO without informing defendant's counsel or affording them an opportunity to oppose); *Einhorn,* 1995 U.S. Dist. Lexis 20546, at *17 (highlighting that plaintiff's attorneys, *inter alia,* instituted three similar law suits against defendants without explanation); *Viola,* 574 F.Supp. at 621 (stating that plaintiff's counsel "insist[ed] upon the relinquishment of a right as a condition of discontinuing a frivolous claim and then [did] not oppose a motion for summary judgment necessitated thereby"). .

Considering the Second Circuit's restrictive approach to the imposition of sanctions upon attorneys, *see Oliveri,* 803 F.2d at 1280, and despite that this Court requires Defendants to reimburse Plaintiffs for their expended attorneys' fees and costs, this Court will not inflict the same burden upon RRK. Taken as a whole, this Court does not believe that the tactics that RRK employed on behalf of Defendants make this case "exceptional" under § 35(a) of the Lanham Act to the point that RRK must also be liable for Plaintiffs' attorneys' fees. Despite that this Court stated in its July 13, 1998 opinion that the record is replete with bad faith, this Court assigned that improper conduct specifically to Unger and not to his attorneys. *See Unger,* 14 F.Supp.2d. at 351–52. Further, under the strict standards followed in this Circuit

with regard to a court's ability to impose sanctions pursuant to its inherent authority or 28 U.S.C. § 1927, this Court does not find sufficient clear evidence in the record that RRK employed delay tactics, intended to raise the costs of the litigation, or misrepresented any fact or law to this Court or to opposing counsel.

## II. Attorneys' Fee Award and Reimbursable Costs:

To determine the amount of a reasonable attorney's fee award, courts apply the "lodestar approach", under which the number of hours an attorney reasonably expended on a litigation is multiplied by a reasonable hourly rate. *See, e.g., City of Burlington v. Dague,* 505 U.S. 557, 559, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Grant v. Martinez* 973 F.2d 96, 99 (2d Cir.1992), *cert. denied, sub nom. Bethlehem Steel Corp. v. Grant,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); *Toys "R" Us, Inc. v. Abir,* No. 97 Civ. 8673, 1999 WL 61817 (S.D.N.Y. Feb.10, 1999). Reasonable hourly rates should be commensurate with the prevailing fees for "similar services by lawyers of reasonably comparable skill, experience and reputation" in the relevant market. *Williams v. New York City Housing Auth.,* 975 F.Supp. 317, 322 (S.D.N.Y.1997) (quoting *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The relevant marketplace in this case is the Southern District of New York, the judicial district in which this Court presides. *See Luciano v. Olsten Corp.,* 109 F.3d 111, 115–16 (2d Cir.1997).

◼ A party must submit to the court contemporaneous time records as a prerequisite for recovering attorney fees, specifying "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983); *accord F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987). The

actual original time sheets are not necessary; submitting an affidavit and attaching a computer printout of the pertinent contemporaneous time records is acceptable. *See Gucci Am., Inc. v. Rebecca Gold Enters., Inc.*, No. 89 Civ. 4736 (BN), 1993 WL 88270, at *3 (S.D.N.Y. March 23, 1993) (citation omitted). Further, while the offered records do not have to be extremely detailed, they should "identify the general subject matter" of the work performed. *Williams*, 975 F.Supp. at 327 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

█ It is then the court's obligation to assess how much of the claimed fee is fair and to what extent it should be reduced. If any of the time records lack the requisite information necessary for a court to properly assess the purpose and necessity of the performed legal task, the court is justified in omitting the vague entries. *See id.* (citation omitted). A court may also exclude any hours that were not legitimately expended or those that were charged out at an excessive rate. *See Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. The Supreme Court has stated:

> Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice is obligated to exclude such hours from his fee submission. In the private sector, billing judgment is an important component in fee setting. . . . Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.

*Id.* (citation and internal quotations omitted). Moreover, when evaluating the reasonableness of the fee application, a court should consider the complexity of the issues in the case and the importance of the case to the parties. *See Smart Style Indus., Inc. v. Pennsylvania General Ins. Co.*, 947 F.Supp. 102, 105 (S.D.N.Y.1996); *Gucci*, 1993 WL 88270, at *4.

In support of their fee applications, Plaintiffs Columbia and Academy have provided this Court with extensive evidence, including affidavits and computer printouts of contemporaneous time records, to establish the fees they incurred during this litigation. The submitted data lists information regarding the date of the work, the attorney's name performing the work, a brief description of the work, and the cost of such work. *See* Sacks Aff. at Ex. D.; Affidavit of Richard Lehv in Supp. of Application by Academy Pictures, A.G. for Attorney's Fees and Costs ("Lehv Aff.") at Ex. A. This Court, therefore, possesses the necessary information to make an assessment of the requested fee award and now turns to a calculation of the reasonable attorneys' fees to which Plaintiffs are entitled. *See Gucci Am., Inc. v. Rebecca Gold Enters., Inc.*, 802 F.Supp. 1048, 1052 (S.D.N.Y.1992).

### A. Columbia's Request:

Columbia has submitted a request totaling $735,785.73—$649,386.32 for legal services and $86,399.41 for costs and expenses. *See* Sacks Aff. at ¶ 15. It appears, however, that this requested amount could have been significantly higher. First, although the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") has represented Columbia in this case since 1988, Columbia only asks for fees that it paid after June 2, 1995, the day on which Fried Frank began to give exclusive attention to the prosecution of Columbia's trademark claims, and until February 28, 1998, the last day for which Fried Frank billed Columbia and Columbia paid Fried Frank. *See id.* at ¶¶ 6, 14, 17. While Columbia claims to have expended $267,879.46 for Fried Frank's representation before June 2, 1995, which included work that Fried Frank used to prepare itself for trial and at trial, Columbia chooses to forgo restitution of those fees. *See id.* at ¶¶ 6, 17. Second, Columbia only seeks reimbursement at the ten percent discounted rate

that Fried Frank billed. *See id.* at ¶ 18.[2] Third, Mr. Ira Sacks, the Fried Frank partner in charge of this litigation, further reduced the amount of the requested fees by reviewing each month's charges for reasonableness and removing any charges he deemed excessive. *See* Memorandum of Law in Supp. of Columbia's Application for Attorney's Fees and Costs ("Columbia Mem.") at 6. Fourth, while Fried Frank spent a total of $109,339.59 in actual and necessary costs between June 2, 1995 and February 28, 1998 (over $20,000 more than the $86,399.41 that Columbia requests), because of a deal between Columbia and Fried Frank, Fried Frank did not charge Columbia for certain expenses that it does charge to other clients. *See* Sacks Aff. at ¶ 21 and n. 4. Thus, without the allowances that Fried Frank used to minimize its bills to Columbia, Columbia apparently would have incurred costs of $856,317.24, $120,531.51 greater than the current request of $735,785.73. *See id.* at ¶ 22.

### B. Academy's Request:

Academy has submitted a request totaling $494,403.28—$433,212.25 for legal services and 61,191.03 for costs and expenses. *See* Academy Mem. at 25; Lehv Aff. at Ex. A. The law firm of Fross Zelnick Lehrman & Zissu, P.C. ("Fross Zelnick") has represented Academy in this action since 1989; however, like Columbia, Academy does not request reimbursement for all expenses incurred from 1989 until the present. On June 8, 1990, Academy and Defendants settled a motion for sanctions that Academy had brought against Defendants for putting Academy to the expense of opposing Defendants' motion for summary judgment. *See* Lehv Aff. at ¶ 4. Academy, therefore, does not include in its fee application any attorneys' fees paid up to and including the 1990 settlement. *See id.* Additionally, Fross Zelnick pruned its hours that it billed to Academy where it

deemed appropriate. *See* Academy Mem. at 13; Lehv Aff. at ¶ 27.

### C. Reasonableness of Plaintiffs' Attorneys' Fees Submissions:

■ This Court has thoroughly examined the records that Plaintiffs have provided and concludes that the hours the attorneys have expended on this litigation are generally reasonable. This was a labor-intensive case for Plaintiffs attorneys, lasting roughly a decade and requiring knowledge of a specialized area of law, trademarks. *See Independent Living Aids, Inc. v. Maxi–Aids, Inc.,* 25 F.Supp.2d 127, 134 (E.D.N.Y.1998); *Gucci,* 1993 WL 88270, at *6. The case necessitated much litigation, including, *inter alia,* numerous pre-trial papers, several motions, extensive discovery, many depositions, a three-day trial, and several post-trial submissions. The case was also one of great magnitude for both Plaintiffs, involving the protection of a famous, well-recognized, and lucrative asset, their trademark in "Bridge on the River Kwai". The attorneys could, therefore, be expected to use their best efforts. *See Smart Style,* 947 F.Supp. at 105. Further, it is noteworthy that Plaintiffs' attorneys did not charge for all hours logged pursuing this case. Both firms truncated their hours where appropriate, Columbia Mem. at ¶ 6; Academy Mem. at 13; Lehv Aff. at ¶ 27, thereby, complying with the Supreme Court's mandate, *see Hensley,* 461 U.S. at 434, 103 S.Ct. 1933, and Columbia chose to waive the alleged $267,879.46 in charges incurred for work performed prior to June 2, 1995, despite that they may have been entitled to reimbursement of these expenses. *See* Sacks Aff. at ¶¶ 6, 17

This Court also finds that the attorneys' hourly billing rates are indeed commensurate with market rates. *See Berlinsky v. Alcatel Alsthom Compagnie Generale*

---

**2.** Fried Frank afforded Columbia a ten percent discount from the rates that Fried Frank normally charges clients because of their long-standing relationship. *See* Sacks Aff. at ¶ 18.

*D'Electricite,* 970 F.Supp. 348, 351 (S.D.N.Y.1997) (approving rates of $495, $365, and $225 for a senior partner, a senior associate, and a junior associate respectively). Considering the experience of the attorneys involved in this litigation as demonstrated by their credentials and their successful performance at trial, this Court does not believe that the charged rates are excessive. *See* Sacks Aff. at ¶¶ 24–29; Lehv Aff. at ¶¶ 28–29. For example, the lead attorney for Fried Frank, Mr. Ira Sacks, is the chair of Fried Frank's intellectual property group, and lead counsel for Fross Zelnick, Mr. Richard Lehv, has primarily engaged in intellectual property litigation for twenty-two of the twenty-six years he has been practicing law. *See* Sacks Aff. at ¶ 24; Lehv Aff. at ¶ 29. This Court also recognizes that while Columbia requests reimbursement at the discounted rate that Fried Frank charged, Columbia did not have to afford the benefit of their billing agreement to Defendants. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 113 (2d Cir.1988). Thus, this Court finds that Plaintiffs fee requests represent a reasonable lodestar.

■ Still, while this Court holds that, as a whole, the hours the firms expended are reasonable, because the time records this Court has received do contain some vague and many clustered entries, this Court will reduce the lodestars accordingly. Various descriptions in the time sheets of Columbia and Academy, such as "meeting," "reviewing documents," "telephone conversation with M. Weissman," "telephone conference with R. Dreben," "letter to Judge Edelstein," and "telephone conference with counsel" fail to indicate the subject matter of the documents reviewed, the intention of the undertaken task, or the topic of the conversation, and thereby, complicate this Court's determination of the appropriateness of the claimed award. *See O'Grady v.*

*Mohawk Finishing Products, Inc.,* No. 96–CV–1945, 1999 WL 30988, at *4 (S.D.N.Y. Jan. 15, 1999); *Independent Living Aids,* 25 F.Supp.2d at 133; *Williams* 975 F.Supp. at 327. "Attorneys should add a reference line to such entries" to indicate the nature and purpose of the work. *Wilder v. Bernstein,* 975 F.Supp. 276, 286 (S.D.N.Y.1997).

Furthermore, Plaintiffs submissions are filled with entries that cluster together several tasks, making it difficult for this Court to ascertain the amount of time devoted to each separate activity. While Plaintiffs argue that making such entries is a standard practice at law firms, Courts have frowned upon them. *See, e.g., Williams,* 975 F.Supp. at 327; *Wilder* 975 F.Supp. at 286; *In re Poseidon Pools of America, Inc.,* 180 B.R. 718, 731 (Bkrtcy. E.D.N.Y.1995).

> [Lumping] several services or tasks into one time sheet entry [makes it] difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided.... It is not the court's job to decipher time entries and guess how much time each activity took .... It is the responsibility of the applicant to make separate time entries for each activity.

*Poseidon Pools,* 180 B.R. at 731 (citations and internal quotations omitted).

This Court will, therefore, decrease Plaintiffs' lodestar to reflect that vague and clustered entries appear in their time records. Because courts in this circuit disfavor "piecemeal attacks on individual entries ... particularly where the application as a whole establishes that the total time expended was generally reasonable and has been adequately described," this Court will reduce Columbia's lodestar by ten percent and Academy's lodestar by fifteen percent.[3] *Gucci,* 1993 WL 88270, at

---

**3.** This Court decreases Columbia's lodestar by only ten percent, as opposed to the fifteen percent deducted from Academy's lodestar, in recognition of Columbia's choice to only seek reimbursement at the ten percent discounted

*4 (reducing lodestar by twenty percent); *accord Carey*, 711 F.2d at 1146 (noting that courts "have endorsed percentage cuts as a practical means of trimming fat from a fee application"); *see Mr. X v. New York State Educ. Dep't*, 20 F.Supp.2d 561, 564 (S.D.N.Y.1998)(deducting twenty percent from lodestar); *Wilder*, 975 F.Supp. at 286 (subtracting ten percent from lodestar); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F.Supp. 510, 520 (S.D.N.Y.1994)(decreasing lodestar by thirty percent). Accordingly, this Court awards Columbia $584,447.69 and Academy $368,230.41 in attorneys' fees.

### D. Reasonableness of Plaintiffs' Costs Submissions:

██ The Lanham Act also provides for the award of costs in all cases. 15 U.S.C. § 1117(a). Out-of-pocket litigation costs are generally recoverable if they are necessary for the representation of the client. Columbia and Academy seek costs in the amounts of $86,399.41 and $61,191.03 respectively. *See* Sacks Aff. at ¶ 15; Lehv Aff. at Ex. A. This Court finds that the majority of the requested costs are reasonable expenses incurred in the course of providing legal services. *See Kuzma v. Internal Revenue Service*, 821 F.2d 930, 933–34 (2d Cir.1987)(permitting photocopying, telephone, travel, and postage expenses); *Toy "R" Us, Inc. v. Abir*, No. 97 Civ. 8673, 1999 WL 61817, at *5 (S.D.N.Y. Feb.10, 1999) (awarding costs for photocopying, messenger services, telecopier, and local transportation); *Pastre v. Weber*, 800 F.Supp. 1120, 1123, 1127 (S.D.N.Y.1991)(allowing costs for photocopying, messenger services, contract printing, travel, meals, and telephone calls). Still, this Court believes that certain requests are not taxable costs to which Plaintiffs are entitled and others are vague. Accordingly, this Court does not permit reimbursement of those costs.

██ Courts must distinguish between out-of-pocket disbursements, such as photocopying, and routine office overhead, such as secretarial services. Both Columbia and Academy request reimbursement for secretarial services, totaling $23,024.56 for Columbia and $395 for Academy. *See* Defendants Mem. at 24 n. 4, n. 5. Courts have recognized that "part of the reason lawyers receive a premium rate is to pay for . . . expenses" such as secretarial services. *Wetchester Legal Servs., Inc. v. County of Westchester*, No. 85 Civ. 3115, 1987 WL 6160, at *5 (S.D.N.Y. Jan.27, 1987), *accord Ginsberg, D.O. v. Valhalla Anesthesia Assocs., P.C.*, No. 96 Civ. 6462, 1998 WL 19997, at *4 (S.D.N.Y. Jan.20, 1998); *Williams* 975 F.Supp. at 324. Thus, this Court disallows these costs because they are absorbed within the attorneys' hourly rates. Moreover, Columbia asks for $163.88 for books, publications, and supplies. *See* Sacks Aff. at Ex. F. Without a further explanation of the purpose of these charges, which Columbia does not provide to this Court, this Court finds that these charges are also non-recoverable overhead costs.

██ Both Plaintiffs also seek restitution for computer research. Columbia requests $11,283.52, and Academy asks for $4,969.46. *See* Defendants Mem. at 24 n. 4, n. 5. The Second Circuit, however, in upholding a district court's denial of the recovery of Westlaw costs, stated that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost." *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 173 (2d Cir.1996) (citation omitted). Therefore, Plaintiffs cannot recompense their Lexis and Westlaw costs.

██ Furthermore, both parties submit vague or incomplete requests, making it difficult for this Court to determine if the entire requested amount is reasonable, thereby, justifying a reduction of the costs the parties seek. *See O'Grady*, 1999 WL

rate and only for the time between June 2, 1995 and February 28, 1998.

30988, at *8; *Scanlon v. Kessler*, No. 97 Civ. 1140, 1998 WL 726047, at * 4 (S.D.N.Y. Oct. 14, 1998). For example, Columbia asks for $18,315.73 for duplicating, while Academy asks for only $2,250.06. Columbia only requests fees and costs from June 2, 1995 to February 28, 1998, yet fails to explain why its copying costs are roughly eight times that of Academy's for a significantly shorter period of time. *See Merritt Meridian*, 95 F.3d at 171 (approving the reduction of copying costs from $17,690.78 to $5,000 where the party did not "explain why all those copies were necessary"). This Court, therefore, reduces Columbia's copying costs by one-half to $9,157.87.

■ Similarly, Academy makes other non-descriptive and vague requests. Academy seeks $1,371.07 for "out-of-pocket expenses", and $570 for a private investigator. *See* Lehv Aff. at Ex. A. Because Academy did not enumerate or describe these "out-of-pocket" expenses nor explain why the special services of a private investigator were necessary, this Court eliminates these costs. *Scanlon*, 1998 WL 726047, at *4. Further, because Academy does not itemize any of its costs, this Court is unable to ascertain their specific reasonableness and, therefore, reduces Academy's claimed costs by an additional ten percent.

■ Finally, Academy also asks for $20,600 for consumer survey costs. *See* Academy Mem. at 14. While other courts have disallowed the reimbursement of consumer survey costs, this Court will permit them. *See Simon & Schuster, Inc. v. Dove Audio, Inc.* 970 F.Supp. 279, 302 (S.D.N.Y. 1997); *Imagineering, Inc. v. Van Klassens, Inc.*, 851 F.Supp. 532, 540; *Gillette Co. v. Wilkinson Sword, Inc.*, No. 89–CV–3586, 1992 WL 30938, at *10 (S.D.N.Y. Feb.3, 1992). In *Simon & Schuster*, the court highlighted that "plaintiffs [did] not demonstrate [ ] that they [were] entitled to recover the costs of conducting their consumer survey" and that the survey was "minimally probative." 970 F.Supp. at

302, n. 23. In *Imagineering*, of the two surveys plaintiffs prepared, the court excluded one from trial while plaintiffs did not introduce the other. 851 F.Supp. at 539. Here, this Court accepted consumer surveys from both parties and found them to be informative and helpful in the advancement of their claims. This Court also relied on the presented surveys in adjudicating this case and specifically stated that "the market surveys entered into evidence suggest actual confusion." *Unger*, 14 F.Supp.2d at 356. Thus, this Court authorizes the recovery of Academy's consumer costs.

Accordingly, after engaging in a line-by-line analysis of the costs that Plaintiffs seek and excluding the above enumerated expenses, this Court awards Columbia $42,769.59 and Academy $48,496.95 in litigation costs and expenses.

*Conclusion*

After carefully considering all submissions and the applicable law, this Court (1) denies Academy's motion to also hold RRK liable for attorneys' fees and (2) awards Columbia a total of $627,217.28—$584,447.69 in attorneys' fees and $42,769.59 in costs and Academy a total of $416,727.36—$368,230.41 in attorneys' fees and $48,496.95 in costs.

SO ORDERED.